# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

============================

## ON MOTION FOR REHEARING

============================

## NO. 03-03-00768-CV

**Pearl Witkowski and Joseph Phillips, Individually and on behalf of a class of all others similarly situated; and Deanna Warner, Individually and on behalf of a class of all others similarly situated, Appellants**

**v.**

**Brian, Fooshee and Yonge Properties, a Texas General Partnership; George Yonge; Jefferson Fooshee; Patrick Brian; and Embrey Partners, Ltd., a Texas Limited Partnership, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. GN000998, HONORABLE PAUL DAVIS, JUDGE PRESIDING**

## O P I N I O N

We grant appellants' motion for rehearing, withdraw our opinion and judgment issued June 23, 2005, and substitute the following in its place.[1]

This appeal arises from the sale of the River Woods apartment complex, part of which was designated as low-income housing, located in Austin, Texas. Appellants—Pearl Witkowski, Joseph Phillips, and Deanna Warner, individually and on behalf of two classes of all others similarly

---

[1] Appellants Witkowski and Warner alternatively moved for rehearing en banc. We overrule that motion.

situated—are former low-income tenants and persons eligible for low-income tenancy at River Woods.[2] Appellants assert that they are entitled to collect damages from appellees, who are the property owners—Brian, Fooshee and Yonge Properties, a general partnership, and Patrick Brian, Jefferson Fooshee, and George Yonge, individuals (collectively, "BFY")—and the proposed purchaser of the property—Embrey Partners, Ltd. ("Embrey")—because these parties acted improperly to effect the release of the low-income housing restrictions, resulting in the low-income tenants' eviction from River Woods.

Following their eviction, appellants filed suit against BFY and Embrey, but the district court granted summary judgments in favor of appellees. Appellants then moved for leave of court to file a fifth amended petition, which was opposed by BFY. Ultimately, the court denied appellants' motion for leave to amend their petition and issued a final judgment in favor of BFY and Embrey as to all claims asserted by appellants, ordering that appellants take nothing.

Appellants now appeal the trial court's decision, urging in five issues that the court erred (1) by granting summary judgment in favor of BFY and Embrey and (2) by denying appellants' motion for leave to amend, thereby "dismissing" the newly asserted claim contained in appellants' proposed fifth amended petition. We will affirm.

**BACKGROUND**

The low-income housing restrictions governing the River Woods complex were imposed pursuant to 12 U.S.C. § 1441a, which was enacted following the savings and loan crisis of

---

[2] Pearl Witkowski was originally joined by her daughter, Delores, as a plaintiff and class representative. Subsequently, Delores withdrew, and Phillips was added as a representative.

2

the late 1980s. *See* 12 U.S.C. § 1441a (2001 & Supp. 2005). As part of § 1441a, Congress established the Resolution Trust Corporation ("RTC") to serve as a receiver of all properties previously held by failed thrift institutions. *See id.* § 1441a(b). The River Woods property was previously held by a failed thrift and, thus, by 1990 was under the RTC's control.

As part of the Act, the RTC was given the authority to sell such residential properties as long as the sale complied with the Affordable Housing Disposition Program ("AHDP"). *See id.* § 1441a(c). Pursuant to the AHDP, purchasers of thrift property must agree to provide residential housing opportunities to lower and very-low income families. *Id.* Specifically, the AHDP mandates that "not less than 35 percent of all dwelling units" shall be reserved for low-income housing. *Id.* § 1441a(c)(3)(E)(i)(I). The AHDP further requires that these restrictions be agreed to in a contract or other recorded instrument. *Id.* § 1441a(c)(3)(E)(ii); *see also id.* § 1441a(b)(10)(A)(i).

In 1991, the RTC sold River Woods to George Yonge, who conveyed it days later to Brian, Fooshee, and Yonge Properties. In order for the sale of River Woods to comply with the AHDP's low-income housing regulations, the RTC and Yonge entered a written Land Use Restriction Agreement ("LURA"), which remained in effect when Yonge transferred the property to BFY. The LURA characterized River Woods as an "'eligible multifamily housing property' as defined in . . . 12 U.S.C. § 1441a(c)(9)(D)" and stated that, "[d]uring the Term, Owner will maintain the Property as multifamily rental housing and will . . . make continuously available for occupancy by Lower-Income Families . . . not less than 40 Units, of which not less than 23 Units shall be made available for occupancy by Very Low Income Families."

The LURA defined the "Term" as continuing either for forty years, or until the earliest one of four specified events occurred. One of the four events that could cause the Term to expire before the forty-year mark was "the date upon which the RTC or the Agency determines . . . (i) that all or a portion of the Property is obsolete as to physical condition . . . making it unusable for housing purposes, and (ii) that no reasonable program of modifications is financially feasible to return the Property or a portion of the Property to useful life." "Agency" was defined in the LURA as "the State Housing Finance Agency [*i.e.*, the Texas Department of Housing and Community Affairs ("TDHCA")] or any agency, corporation, or authority of the United States government that normally engages in activities related to the preservation of affordable housing," which included the RTC or its predecessor, the Federal Deposit Insurance Corporation ("FDIC"). The LURA did not require any procedural steps, such as notice and hearing, before the applicable government agency could end the Term by determining that the property was physically obsolete and financially infeasible to repair.

Six years after acquiring River Woods, BFY agreed to sell the apartment complex to Embrey Partners. This sale was conditioned on obtaining a release of the low-income housing restrictions contained in the LURA. The purchase agreement stated as a "condition precedent" that "Purchaser shall have obtained (and Seller shall have cooperated in a reasonable manner to assist Purchaser) an executed instrument filed at or prior to Closing which abandons and/or releases the restrictive covenants, so that the result is the [LURA] is null and void."

After Embrey and BFY considered various options for how to remove the "encumbrance" of the LURA, Yonge wrote to the TDHCA requesting that it release the LURA "due

4

to the condition of the property." Embrey joined BFY's efforts to have the TDHCA release the LURA. Accordingly, Embrey submitted to the TDHCA a physical inspection report, which described the property as dilapidated and unsuitable for residential habitation, and a redevelopment proposal, which suggested demolishing the existing structure and constructing a new facility on the land.[3]

In February 1998, the TDHCA recommended to the FDIC that the River Woods LURA be released. The letter was written by the Executive Director of the TDHCA and stated, "The Department has inspected the property and recommends the LURA be lifted for the entire property. There are project conditions which support a finding of obsolescence and that it is not economically feasible to rehabilitate the existing structures." The letter also described specific, physical problems that the TDHCA identified as rendering the property unsuitable for habitation or rehabilitation and concluded by listing several reasons to support the agency's recommendation that the LURA be terminated.

In March 1998, the FDIC signed an order releasing River Woods from the LURA. The order stated that—in reliance on the representations that the property was physically unsuitable for habitation and that neither modifications nor repairs were financially feasible—the FDIC, as successor in interest to the RTC, was releasing and discharging the River Woods property from all conditions, obligations, restrictions, and duties of the LURA. BFY, Embrey, and the TDHCA then entered an agreement reflecting the FDIC's determination that the LURA should be released because

---

[3] The appellants challenge the accuracy of these statements, urging that a proper inspection and financial analysis were never done and that the appellees purposefully misrepresented the status of the property in order to fraudulently induce the TDHCA to release the LURA.

the River Woods property was unsuitable for residential housing, not financially feasible to repair, and in need of demolition.

For one year after these determinations were made, the River Woods apartments continued to be rented to tenants. On August 13, 1999, the day the sale was completed,[4] eviction letters were sent to each of the River Woods tenants, notifying them that they had one month to leave, as demolition of the property would begin at 8:00 a.m. on September 14, 1999. The River Woods manager offered to refund all security deposits to the tenants and offered to compensate them fifteen dollars per day for each day that a tenant moved out before the 30-day deadline.

Appellants filed suit on April 4, 2000. They alleged a variety of claims against appellees—some against BFY and Embrey separately, and some against them jointly—including causes of action for constructive fraud, breach of contract, breach of fiduciary duty, tortious interference with a contract, and breach of an implied warranty of habitability. All of appellants' claims were based on allegations that BFY and Embrey intentionally misrepresented the condition of the River Woods property to the TDHCA and the FDIC in order to improperly induce the agencies to release the LURA on the grounds that the property was unsuitable for habitation and financially infeasible to repair.

BFY initially sought summary judgment on appellants' claims for breach of an implied warranty of habitability, breach of fiduciary duty, and unjust enrichment. The trial court

---

[4] Embrey was, ultimately, not the purchaser of the property. On May 11, 1998, Embrey entered an escrow transfer agreement to assign its interest in the purchase of River Woods to TCR South Central, Inc., who then assigned the interest to South Congress Reserve Limited Partnership. The purchase was thereafter completed by South Congress Reserve, which was not named as a party to this suit.

granted the motion only as to the breach of implied warranty of habitability claim.[5] Appellants do not appeal the first summary judgment.

Embrey joined BFY in a second summary judgment motion, seeking to dismiss all of appellants' claims based on three alternative grounds: (1) appellants lack standing, (2) appellants failed to state a cause of action upon which relief could be granted, and (3) appellees are immune under the *Noerr-Pennington* doctrine,[6] which protects government communications. The trial court granted BFY's and Embrey's summary judgment motion without stating the grounds and denied appellants' request to issue findings of fact and conclusions of law.

Appellants then sought leave to amend their petition, which had previously been amended four times, urging that they needed an opportunity to "more clearly assert a [fraud] claim that has been the basis of their pleadings since the day this action was filed." Appellants wanted to submit a fifth amended petition to include a claim for fraud on the basis that appellees had made misrepresentations *to the tenants* about the condition of the property, whereas their previous pleadings had focused on the alleged misrepresentations made *to the TDHCA and the FDIC*. Following BFY's opposition to this motion, the trial court refused to allow appellants leave to file

---

[5] BFY asserts that the trial court's order on the first summary judgment motion dismissed all three claims that were addressed in its first motion because appellants conceded at the hearing that the only remaining claim of the three was the breach of implied warranty of habitability claim. The trial court later clarified, in issuing its final judgment disposing of all claims, that the breach of fiduciary duty and unjust enrichment claims had not been disposed of by the first order. In any event, the outcome of this appeal is not affected by whether these two claims were disposed of by the first summary judgment or by the final judgment.

[6] *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

7

a fifth amended petition. The trial court then issued a final, take-nothing judgment against appellants on all of their claims.[7]

Appellants now urge this Court to reverse the trial court's final judgment on the grounds (1) that the summary judgment was inappropriate because they have standing as third-party beneficiaries[8] and (2) that their motion for leave to file a fifth amended petition should have been granted and the new fraud claim contained within their proposed fifth amended petition should not have been dismissed.

## ANALYSIS

### *Summary Judgment Based on Lack of Standing*

A movant for summary judgment pursuant to Rule 166a(c) carries the burden to show that no genuine issue of material fact remains and that it is entitled to summary judgment as a matter of law. Tex. R. Civ. P. 166(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). In reviewing the summary judgment, we view the evidence in a light most favorable to the nonmovant and determine whether the movant either disproved at least one element of each of the nonmovant's theories of recovery or pled and conclusively established each element of its own

---

[7] Although the trial court had already resolved two summary judgment motions against appellants that collectively addressed each claim raised by appellants, the court subsequently issued a final take-nothing judgment to clarify that all of appellants' claims were dismissed, given the dispute addressed in footnote five about whether the first summary judgment had disposed of one claim or three claims.

[8] Appellants additionally challenge the summary judgment by claiming that they stated viable claims against the appellees and that the appellees are not entitled to immunity under the *Noerr-Pennington* doctrine—the alternative grounds on which appellees sought summary judgment. We do not reach these issues.

8

affirmative defense. *Western Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex. 2005); *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001). When a trial court grants summary judgment without specifying the ground for its decision, summary judgment will be affirmed on appeal if "any of the theories advanced are meritorious." *Urena,*162 S.W.3d at 550.

BFY and Embrey asserted three alternative grounds for summary judgment. Because the trial court did not specify the ground upon which it granted summary judgment, the judgment must be upheld if we hold that any one of appellees' three grounds is meritorious. *See id*. We begin by considering the primary ground argued at the summary judgment stage: whether appellants had standing. Appellants assert in their first issue that they have standing based on their status as third-party beneficiaries under both federal statute (the AHDP) and the contractual agreement (the LURA).

Whether a statute or a contract provides a specific cause of action or a right of enforcement requires us to construe the statutory and contractual language as a matter of law. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979); *Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 321 (Tex. 2000) (Hecht, J., concurring). This Court's objective in construing written language, whether it be that of a statute or contract, "is to give effect to the intent expressed in that language by the person or persons who wrote it or who agreed to be bound by it. . . . When we construe a statute, we say what the Legislature intended by the words it chose. When we construe a contract or deed, we say what the parties intended by the language they agreed to." *Lane Bank Equip. Co.*, 10 S.W.3d at 321 (citing *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995) (statutory construction), and *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.

1994) (contract interpretation)). Consequently, our analysis must begin with the actual language of the statute and contract. *Touche Ross*, 442 U.S. at 568; *Lane Bank Equip. Co.*, 10 S.W.3d at 321.

No one disputes that both the AHDP and the LURA provide express rights to low-income tenants, including appellants, to enforce the low-income housing restrictions contained within the statute and the contract. Section (c)(11)(B) of the AHDP states: "The lower-income occupancy requirements applicable under paragraphs (2), (3), (12)(C), (13)(B), and (14)(C) shall be judicially enforceable against purchasers of property under this subsection or their successors in interest by affected very low- and lower-income families. . . ." 12 U.S.C. § 1441a(c)(11)(B). Section 6.2 of the LURA states that "[t]he occupancy requirements set forth in Section 2.2 of this Agreement also shall inure to, and may be judicially enforced against Owner by affected Lower-Income Families and Very-Low Income Families."

The issue is whether appellants' right to enforce these enumerated provisions provides them with a cause of action against BFY and Embrey, the property owners and proposed purchaser of the property, for allegedly misrepresenting to the TDHCA and the FDIC that, pursuant to the LURA's term provision, the restrictions should be discontinued based on the dilapidated and irreparable condition of the property.

Each of the specifically enforceable provisions of the AHDP—provisions (2), (3), (12)(C), (13)(B), and (14)(C)—involve low-income occupancy requirements, but none of them govern the time period for which the requirements must be satisfied or the events that would cause such a term to expire. *See id.* §§ 1441a(c)(2), (3), (12)(C), (13)(B), (14)(C). The closest any of these provisions comes to governing the term of the restrictions is section (3)(E), which states that 35%

of all units "shall be made available for occupancy by and maintained as affordable for lower-income and very low-income families *during the remaining useful life of the property.*" *See id.* § 1441a(c)(3)(E).

The specifically enforceable provision of the LURA—section 2.2—similarly pertains to the number of units that must be reserved for low-income tenants, requiring the property owner to "make continuously available for occupancy by Lower-Income Families . . . not less than 40 Units, of which not less than 23 Units shall be made available for occupancy by Very Low Income Families." Unlike the AHDP, however, the LURA expressly states that these requirements are to be satisfied "*[d]uring the Term*" and specifies that the Term shall continue for forty years unless one of four designated events occurs and causes it to expire sooner.

Appellants argue—based on the language that the housing restrictions shall be effective "during the remaining useful life" in section (3)(E) of the AHDP and "during the Term" in section 2.2 of the LURA—that their right to enforce the term provisions is "expressly integrated" into their right to enforce the occupancy requirements. Accordingly, they assert that they have standing as third-party beneficiaries of both the statute and the contract to collect damages from BFY and Embrey for causing the Term to expire prematurely by misrepresenting the condition of the property to the TDHCA and the FDIC. We are not persuaded by appellants' argument.

We apply a "strict rule of construction" to statutory enforcement schemes and imply causes of action only when the drafters' intent is clearly expressed from the language as written. *Brown v. Arturo de la Cruz*, 156 S.W.3d 560, 567 (Tex. 2004). When a statute explicitly provides certain rights of enforcement, but is silent as to the right sought to be enforced, we may presume that

11

the Legislature intended for that right to not be included. *Touche Ross*, 442 U.S. at 571-72 ("implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best"); *see also Old Am. County Mutal Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 115 (Tex. 2004) ("because we presume every word of a statute has been included or excluded for a reason, we will not insert requirements that are not provided by law"). Furthermore, a right of enforcement should not be implied simply because the statute "fails to adequately protect intended beneficiaries." *Brown*, 156 S.W.3d at 567. The fact that a person has suffered harm from the violation of a statute does not automatically give rise to a private cause of action in favor of that person. *Cannon v. University of Chicago*, 441 U.S. 677, 688 (1979).

The law similarly disfavors implying third-party rights of enforcement in the contractual context: a third-party who suffers harm as the result of a contracting party's breach does not necessarily have a right to collect damages for that breach. *See Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002). "A third-party may recover on a contract only if the contracting parties intended to secure a benefit to that third-party, and only if the contracting parties entered into the contract directly for the third party's benefit." *Id*. (citing *MCI Telecomms. Corp. v. Texas Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). A court will not create a third-party beneficiary contract by implication. *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 773 (Tex. App.—Corpus Christi 2003, no pet.). Rather, an agreement must clearly and fully express an intent to confer a direct benefit to the third-party. *Id*.

Both the AHDP and the LURA expressly define which provisions of the statute and the contract that low-income tenants are entitled to enforce. By granting some specific rights of

enforcement regarding the low-income housing restrictions, Congress and the contracting parties demonstrated that, when they intended appellants to have certain rights of enforcement, they understood how to provide them. *See Touche Ross*, 442 U.S. at 572. Nevertheless, neither the statute nor the contract provide appellants either a blanket right of enforcement or the express cause of action asserted here. Because Congress and the contracting parties granted certain rights of enforcement, yet remained silent on whether low-income tenants may collect damages from the property owner or proposed purchaser for inducing a premature expiration of the Term, we conclude that neither the statute nor the contract expresses a clear intent to provide appellants with this cause of action. Consequently, we decline to imply such a right of enforcement into either the statute or the contract. *See Touche Ross*, 442 U.S. at 571-72; *Ortega*, 97 S.W.3d at 775-76.

We acknowledge that the AHDP and the LURA mandate that the housing restrictions shall remain effective "during the useful life" and "during the Term," respectively. Yet, this alone does not provide appellants with a right to enforce the term provisions. The right to sue a property owner based on its failure to make available the required number of low-income units is not identical to or inclusive of the right to hold the owner or proposed purchaser liable for misrepresenting to a government agency that the housing restrictions should be released because the property is dilapidated and irreparable. *See Akinseye v. Bigos*, 75 F. Supp. 2d 976, 979-80 (D. Minn. 1998) (reaching similar conclusion that low-income tenants' right to enforce AHDP housing restrictions did not incorporate right to enforce rent limitations, despite fact that occupancy requirements mandated units be "maintained as affordable," because rent limitations were not expressly included in list of provisions expressly enforceable by third-party beneficiaries).

13

Furthermore, even if the statute or contract entitled low-income tenants to enforce the term provisions, BFY and Embrey were not the ultimate decision-makers responsible for determining that the Term had expired. That was the duty of the relevant government agencies, the TDHCA and the FDIC (as predecessor to the RTC). The LURA specified that the Term would expire if "*the RTC or the Agency determines* . . . (i) that all or a portion of the Property is obsolete as to physical condition . . . making it unusable for housing purposes, and (ii) that no reasonable program of modifications is financially feasible to return the Property or a portion of the Property to useful life." (Emphasis added.) Additionally, the 1998 FDIC Affordable Housing Program Compliance Manual stated, "[u]pon request from the property owner, *monitoring agencies may approve* a release from the LURA when one of the conditions discussed [in the LURA term provision] is documented. *Upon recommendation by the Agency*, the *FDIC will execute the release*. . . . If a monitoring agency is satisfied that one of these conditions is present, release from the LURA may be authorized by the FDIC and given to the owner." (Emphasis added.)

Here, this exact procedure was followed. First, the property owners (BFY) and the proposed purchaser (Embrey) requested that the monitoring agency (the TDHCA) release the LURA because the property was physically obsolete and financially infeasible to repair. BFY and Embrey provided documentation—an independently prepared inspection report and redevelopment proposal—to support their claims about the condition of the property. The TDHCA conducted its own inspection of the property, verified the property's dilapidated and irreparable condition, and recommended to the FDIC that the LURA be released. Based on the TDHCA's recommendation, the FDIC then authorized the release of the LURA.

14

Neither the AHDP nor the LURA create an express or implied cause of action that would entitle appellants to collect damages from BFY or Embrey for misrepresenting the condition of the property to the state and federal agencies. Thus, appellants lack standing to sue appellees in this case, and their first issue is overruled.

Because the trial court did not specify its grounds for granting BFY's and Embrey's summary judgment motion, and because the lack of standing was an appropriate ground on which to grant summary judgment, we do not reach appellants' second and third issues challenging the two alternative grounds asserted for summary judgment. *See Urena,* 162 S.W.3d at 550.

***Motion for Leave to Amend and Dismissal of Fraud Claim***

After the trial court granted the second summary judgment in favor of BFY and Embrey, appellants sought leave to file a fifth amended petition in order to clarify their pleadings on fraud. In their four previous petitions, appellants had focused their fraud claims on the alleged misrepresentations that BFY and Embrey made about the condition of the property *to the TDHCA and the FDIC* in order to induce the release of the LURA. In their proposed fifth amended petition, which was attached to their motion for leave, appellants asserted that BFY and Embrey committed fraud by misrepresenting the condition of the property *to the tenants* in order to continue collecting rent after determining that the property was unsuitable for habitation. BFY opposed the motion for leave to amend. Thereafter, the trial court denied appellant's motion and issued a final judgment against appellants on all claims.

In appellants' fourth and fifth issues, they assert that the trial court erred by refusing to grant them leave to amend their petition and by dismissing the fraud claim included in their fifth

amended petition. However, because the trial court refused to consider their fifth amended petition, the court did not actually "dismiss" the new fraud claim contained within that pleading. Hence, appellants' fifth issue is overruled and the only remaining issue is whether the trial court erred in denying appellants' motion for leave to amend.

We review a trial court's denial of leave to amend for an abuse of discretion. *Tex-Air Helicopters, Inc. v. Galveston County Appraisal Review Bd.*, 76 S.W.3d 575, 581 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Pursuant to Texas Rule of Civil Procedure 63, a party is entitled to amend its petition "within seven days of the date of trial or thereafter, . . . unless there is a showing that such filing will operate as a surprise to the opposing party." Tex. R. Civ. P. 63. A summary judgment proceeding is a trial within the meaning of Rule 63. *Goswami v. Metropolitan Sav. & Loan Assoc.*, 751 S.W.2d 487, 490 (Tex. 1988). "[T]he trial court may conclude that the amendment is on its face calculated to surprise or that the amendment would reshape the cause of action, prejudicing the opposing party and unnecessarily delaying the trial." *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 940 (Tex. 1990); *Hardin v. Hardin*, 597 S.W.2d 347, 349 (Tex. 1980).

Appellants claim that, because no trial date was set at the time they filed their motion, they were not within the seven-day window and, therefore, should have been permitted to amend their pleadings. In making this argument, however, appellants ignore that a summary judgment proceeding is considered a trial for Rule 63 purposes. *Goswami*, 751 S.W.2d at 490. Appellants' motion for leave was not filed until after two separate summary judgments had been entered against them, including one that dismissed their related fraud claims. In denying their motion for leave, the

16

court stated that it believed the issues proposed in appellants' fifth amended petition had been disposed of by its prior rulings. *See Mitchell v. Laflamme*, 60 S.W.3d 123, 132 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (trial court should deny motion for leave to amend if it has already rendered judgment).

Appellants admit that they had been aware of the facts to support their new fraud claim—regarding the misrepresentations made by BFY and Embrey to the tenants—since the beginning of the lawsuit. In fact, they stated in their motion that the new claim "relies on the same facts as were the basis for the implied warranty of habitability claim," upon which summary judgment had already been granted, and that the claim "has been the basis of their pleadings since the day this action was filed." Yet, in the two and a half years that their suit was pending, during which appellants filed four amended petitions, they never asserted this fraud claim. *See Sosa v. Corpus Christi*, 739 S.W.2d 397, 400 (Tex. App.—Corpus Christi 1987, no writ) (in context of trial amendment, court should deny leave to amend if "new matter was known or could have been known through the exercise of due diligence . . . at a time [that] would have enabled [claimant] to include the claim in his formal pleadings.")

Because appellants failed to seek leave until after two summary judgment proceedings had been completed, and because they had been aware of the necessary facts to support their amended claim for over two years, the trial court correctly denied their motion. Upon appellees' objections to appellants' attempt to amend their pleadings at this late stage, it was not an abuse of discretion for the trial court to determine that, on its face, the amendment was calculated to cause

17

surprise or that it would unfairly prejudice BFY and Embrey and cause unnecessary delay. *See Greenhalgh*, 787 S.W.2d at 940. Appellants' fourth issue is overruled.

## CONCLUSION

Summary judgment was properly granted in favor of BFY and Embrey because appellants do not have standing as third-party beneficiaries to either the federal statute or the agreement entered pursuant to that statute's requirements. It was also proper for the trial court to deny appellants' motion for leave to amend their petition a fifth time and to refuse to consider the new claim asserted in the proposed fifth amended petition. Having overruled appellants' issues, we affirm the final judgment of the trial court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: December 8, 2005