# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-12-00568-CV

---

**Thomas O. Bennett, Jr., James B. Bonham Corporation, and Wayne H. Paris, Appellants**

**v.**

**Randy Reynolds, Larry Grant and Richard T. Miller, Appellees**

---

### FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT
### NO. 8717, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Thomas O. Bennett, Jr. and the James B. Bonham Corporation appeal a final take-nothing summary judgment on claims they had asserted against Randy Reynolds, Larry Grant, and Richard T. (Dick) Miller. The judgment also imposed sanctions jointly and severally against Bennett, Bonham, and their attorney in this proceeding, Wayne H. Paris, and all three of them (collectively, and as applicable, "appellants") have also appealed these respective awards against them. We will affirm the district court's judgment in its entirety.

## BACKGROUND

The parties to this appeal are likely familiar to many readers already. Appellants Bennett and Bonham were the defendants in the notable "cattle-rustling case" whose trial outcome prompted a seminal Texas Supreme Court precedent addressing the due-process-based constraints

on the size of punitive-damages awards (*Bennett I*).[1] The appellees here—i.e., the defendants sued by appellants below—had each been adverse to Bennett and Bonham in *Bennett I*: Reynolds was the successful plaintiff; Grant was the former Bennett/Bonham employee who provided key evidence in support of Reynolds; and Miller, an attorney, represented Reynolds.[2]

As illustrated by the opinions of both the supreme court and of this Court, a striking feature of *Bennett I* was an underlying controversy that encompassed not only a comparatively straightforward disagreement over cattle ownership, but an extraordinary panoply of collateral conflicts entailing, among other things, alleged attempts by Bennett to alter evidence and to bribe, threaten, or punish Grant.[3] It is thus perhaps not surprising that this same underlying controversy has likewise birthed a succession of collateral legal proceedings elicited or initiated by Bennett, Bonham, or both, seeking tort remedies or even criminal or administrative sanctions against their *Bennett I* adversaries. We recently addressed some of these endeavors in *Bennett v. Grant* (*Bennett*

---

[1] *See Bennett v. Reynolds*, 242 S.W.3d 866, 869-76 (Tex. App.—Austin 2007), *rev'd & remanded in part by* 315 S.W.3d 867 (Tex. 2010). The supreme court affirmed our judgment affirming imposition of liability for punitive damages against both Bennett and Bonham (and neither had challenged our affirmance of the judgment awards of actual damages for converting the cattle in question), but held that the punitive-damages awards we affirmed—$250,000 against Bennett and $1 million against Bonham—were impermissibly disproportionate to the actual damage award under "prevailing [Due Process] ratio analysis." 315 S.W.3d at 871-85. On remand, we applied the supreme court's guidance from *Bennett I* in suggesting a remittitur of all but $10,000 of the punitive-damages award from each defendant. *Bennett v. Reynolds*, No. 03-05-00034-CV, 2010 Tex. App. LEXIS 9213, at *3-15 (Tex. App.—Austin Nov. 18. 2010, no pet.) (mem. op. on remand) (*Bennett II*); 2011 Tex. App. LEXIS 449, at *1 (Tex. App.—Jan. 19, 2011, no pet.) (supp. op. on remand).

[2] *See Bennett I*, 315 S.W.3d at 869.

[3] *See id*. at 869-71.

2

*III*),[4] which had originated as a slander suit Bennett brought against Grant for implicating him in cattle theft.[5] A jury ultimately rejected Bennett's slander claim, and the district court saw fit to sanction Bennett for prosecuting it.[6] In the meantime, through persistent efforts by Bennett and Bonham, Grant had been indicted in Navarro County (Bennett's home turf) for witness-tampering and attempted bribery in allegedly soliciting payment from Bennett in exchange for Grant's photographs of the disputed cattle.[7] With the legal assistance of Miller or his law office, Grant ultimately obtained dismissal of the criminal charges on limitations grounds.[8] Thereafter, citing this attempt to have him criminally sanctioned, Grant asserted malicious-prosecution claims against both Bennett and Bonham in the pending *Bennett III* proceeding.[9] The *Bennett III* jury found in Grant's favor on those claims and awarded him over $2 million in actual and punitive damages.[10] Although concluding that the supreme court's guidance in *Bennett I* compelled a reduction in the size of the punitive-damage awards, we otherwise affirmed the district court's judgment.[11]

---

[4] No. 03-11-00669-CV, 2014 Tex. App. LEXIS 8849 (Tex. App.—Austin Aug. 13, 2014, no pet. h.).

[5] *See id*. at *30.

[6] *See id*. at *76.

[7] *See id*. at *6-11.

[8] *See id*. at *14.

[9] *See id*. at *14-15.

[10] *See id*. at *4.

[11] *See id*. at *84-85.

The present proceeding (which we will identify as *Bennett IV*) stems from a similar effort by Bennett and Bonham to attack, through the courts, both factual underpinnings of the *Bennett I* judgment and individuals who had helped secure that judgment against them. In April 2007—after Grant and Miller had obtained dismissal of the criminal proceedings against Grant, but while the *Bennett I* appeal was still pending in this Court and *Bennett III* was still pending in the district court—Bennett and Bonham, with Paris as their new and sole counsel, sued Grant (once again), plus Reynolds and Miller, seeking actual damages "of at least $2,000,000," plus punitive damages, based on theories of alleged "fraud," "participation in fraudulent acts," and "conspiracy." "[A]t the core of all of Appellants['] claims" in *Bennett IV*, as they have explained in this appeal, was what they characterized as "a false extra-judicial statement made by Miller at a barbeque social function in San Saba, Texas" attended by "eight (8) local townspersons" prior to the October 2004 *Bennett I* trial. Specifically, appellants complained that Miller had "falsely stated" that Bennett "was into and dealt with drugs and prostitution."

Miller acknowledges that he made a statement referencing such perceptions about Bennett (appellees have even termed it "the Barbeque Statement") at a small social gathering hosted by Marvin and Cynthia Weatherby in their San Saba County home sometime before the *Bennett I* trial.[12] It had happened that the Weatherbys' other guests included Jimmy Shook, a longtime friend of Miller and fellow San Saba attorney who was then serving on the legal team representing Bennett

---

[12] While appellants alleged that these events occurred in August 2004, about two months before the *Bennett I* trial, there was evidence suggesting that the Barbeque Statement may have instead preceded Bennett's February 2003 trial on his criminal charges related to the disputed cattle.

4

and Bonham in *Bennett I*.[13]  The topic of the *Bennett I* lawsuit came up in conversation between the two lawyers.  According to Miller, he "told [Shook] that I had heard Bennett was into drugs and prostitution in Corsicana," the Navarro County city where Bennett's primary residence is located.[14]

Bennett has vigorously denied any involvement in drugs or prostitution, and appellees have not joined issue with his claim.  But as for why or how the Barbeque Statement made Miller and the other two appellees liable for millions in "fraud" or "conspiracy" damages, appellants alleged that:  (1) the Barbeque Statement was repeated by one or more of the attendees at the Weatherbys' gathering, (2) to an extent that it became universally known "coffee shop talk in San Saba, Texas," (3) to an extent that it reached the persons who were later selected as jurors in *Bennett I*, and (4) it inflamed or prejudiced the jury against Bennett and Bonham to an extent that it, not the evidence

---

[13]  During his subsequent testimony on the sanctions issue, Shook would explain that the group in attendance at the Weatherbys that evening were close friends who would convene regularly on Friday evenings and that the Weatherby gathering had been one of those occasions.  Further, in response to questioning from Miller, Shook agreed that the purpose or content of these gatherings was to "eat supper, talk, socialize, [and] maybe have a beer or two."

[14]  Miller would later aver that the Barbeque Statement was in response to a preceding assertion by Shook that Bennett "did not steal any cattle and was a good guy."  Miller added that the origins of the notion or perception that Bennett had been involved in "drugs and prostitution" had been a since-deceased San Saba Church of Christ minister who had previously lived in Corsicana and had divulged to Miller that he heard such "rumors" about Bennett there.  (Miller further claimed that the minister had conveyed this information in the context of warning Miller, upon learning of the lawyer's involvement in *Bennett I*, that Bennett was "a dangerous man").  In contrast, appellants pled (but ultimately did not attempt to support) that the original source of the "drugs and prostitution" allegation had been Grant.

Appellants further pled that Miller, in addition to uttering the Barbeque Statement, had "individually and on behalf of Defendant Reynolds[] falsely stated to other persons that Bennett was involved in drugs and prostitution."  As with their allegation that Grant had originated the "drugs and prostitution" notion, appellants would not attempt to present evidence of any additional statements by Miller, but relied solely on the Barbeque Statement as the purported originating cause of their injuries.

5

presented in that case,[15] caused the jury to render the verdict it did. Similarly, premised on this same alleged toxic "coffee shop talk" they attribute to the Barbeque Statement, appellants would later amend their pleadings to add theories of business disparagement, tortious interference with prospective business relationships, and related "conspiracy" allegations.

Appellants further alleged that appellees intended the Barbeque Statement to trigger this very chain of events as part of a broader scheme to "unlawfully" procure or "extort" money and property from Bennett and Bonham. Other components of the scheme included, according to appellants: (1) the *Bennett I* suit itself, wherein Reynolds and counsel Miller "falsely accus[ed] Plaintiff Bennett of conversion" and later attempted to execute on Reynolds's "wrongful judgment;" (2) similarly, Grant's "false and misleading" statements implicating Bennett in cattle theft; (3) the attempts by Grant (according to Bennett) to extort money from him in exchange for the cattle photographs and favorable testimony, for which "Grant was subsequently indicted [in Navarro County] for attempted bribery and tampering with a witness" (i.e., the subject of Grant's malicious-prosecution counterclaims in *Bennett III*); (4) Miller or his firm's representation of Grant in those criminal proceedings and their ultimate success in having the charges dismissed on limitations grounds; and (5) a 2001 offer conveyed by Miller (as Reynolds's lawyer) to Shook (as Bennett and Bonham's lawyer) whereby Reynolds would agree to settle his *Bennett I* claims and "see to it that all charges under the indictment [against Bennett] were dropped" in exchange for $150,000.

As a further component of this alleged scheme, appellants complained (and it is undisputed) that Miller obtained a pretrial order in limine in *Bennett I* that presumptively barred the

---

[15] I.e., the evidence detailed extensively in the *Bennett I* opinions of the Texas Supreme Court and of this Court.

6

parties and counsel from mentioning or offering evidence of "[a]ny and all conversations between Richard T. Miller and Jimmy Shook concerning Defendant Thomas O. Bennett's involvement with prostitutes and controlled substances."[16]  Bennett and Bonham's legal team in *Bennett I* (including Shook) understandably did not oppose this ruling, nor did it attempt to revisit these issues during voir dire or trial or elicit a ruling that would have preserved error regarding their exclusion.[17]  But in *Bennett IV*, the same parties, now represented by appellant Paris instead, attempted to portray the motion and order in limine as confirmation of appellees' malevolent intent, asserting that "Miller, individually, and on behalf of Defendants Reynolds and Grant, succeeded in eliminating all of the references to [the Barbeque Statement] by a motion to exclude the false statements, although all those in the community had already heard such remarks, in order to prevent [Bennett and Bonham] from reporting the truth to the Court and jury."

A brief summary of *Bennett IV*'s ensuing procedural history further illuminates the nature of appellants' lawsuit and the context of their appellate complaints:

- In contrast to the *Bennett I* and *Bennett III* lawsuits, which had been filed and were ultimately litigated in the district court of San Saba County, Bennett and Bonham, through Paris, filed their original petition in *Bennett IV* in the district court of neighboring Lampasas County. Each appellee responded with a motion to transfer venue to San Saba County, disputing that venue was proper in Lampasas County, asserting that it was instead proper in San Saba

---

[16]  The motion and order further noted that "[t]hese conversations are immaterial, irrelevant, and their probative value is outweighed by their prejudicial nature."

[17]  *See, e.g.*, *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013) (explaining that trial court's grant of motion in limine does not in itself exclude evidence or preserve error regarding such exclusion).

County, and urging further that San Saba was likewise the most convenient venue for the parties and witnesses.[18]

- In response, appellants amended their original petition to make two key changes. First, they dropped Bennett as a plaintiff, leaving only Bonham, and subsequently attempted to distinguish the subject matter of *Bennett IV* from the *Bennett III* suit pending in San Saba district court on the basis that the latter was a "slander suit" involving only Bennett. Second, appellants elaborated that the linchpin of their venue theory was that Reynolds had resided in Lampasas County at the time of the "last overt act carried out by Defendants" in furtherance of their "conspiracy"—the December 2006 dismissal of the Navarro County criminal proceedings against Grant.[19]

- Following a hearing, the Lampasas district court signed an order granting appellees' motions and transferring the case to the district court of San Saba County (the same court and judge before whom *Bennett III* was pending). The Lampasas court did not specify the grounds on which it had relied.

- In the meantime, appellees had (subject to their venue challenges) filed answers and also moved for sanctions. Following transfer of the case to San Saba County, appellees filed traditional and no-evidence motions for summary judgment on all of Bonham's claims. The motions were set for hearing in mid-February 2008.

- Appellants responded in part by amending their pleadings again to rejoin Bennett as a plaintiff and add their business-disparagement theory. The summary-judgment hearing was reset for a date in April 2008.

- Appellants also filed a motion for change of venue back to Lampasas County under Rule of Civil Procedure 257, asserting that local prejudice against Bennett and Bonham was so great that no impartial jury could be assembled in San Saba County. Appellants set their Rule 257 motion for hearing at the same time as the summary-judgment hearing.

- In response to the Rule 257 motion, appellees moved for a continuance of the hearing on that motion, seeking additional time for discovery. With this, appellees urged that the district court should defer any ruling on the Rule 257 motion until it could first address the pending summary-judgment motions, as a final summary judgment could conclude the case prior to trial and thereby moot appellants' expressed concerns about jury prejudice. The district court continued the hearing on the Rule 257 motion and proceeded to hear the summary-judgment motions first.

---

[18] *See* Tex. Civ. Prac. & Rem. Code § 15.002.

[19] *See id.* §§ 15.002(a)(2), .005.

8

- Seven days before the rescheduled summary-judgment hearing, appellants filed a supplement to their petition adding their tortious-interference theory. The summary-judgment hearing was again rescheduled and reset to a date in July 2008.

- In advance of the new hearing date, appellants filed another amended pleading (their fourth) incorporating their supplemental pleading. Also, reacting to limitations grounds appellees had asserted in their summary-judgment motions, appellants added some new discovery rule allegations that are instructive. In support of their limitations grounds, appellees had argued that Bennett and Bonham had acquired not only constructive knowledge of the Barbeque Statement from Shook prior to the 2004 *Bennett I* trial, but also actual, personal knowledge, citing a pretrial deposition in which Bennett had angrily confronted Miller for telling Shook "I was a dope dealer and I run prostitution."[20] In response, appellants amended their pleadings (with corresponding supplements to Bennett's sworn affidavits) to assert that (1) even while the Barbeque Statement had become universally known "coffee shop talk" in San Saba prior to the *Bennett I* trial, Bennett and Bonham's injuries from it had nevertheless been "inherently undiscoverable" and neither had been nor reasonably could have been discovered by Bennett until May 2006; and (2) the statement to which Bennett had referred during his 2004 deposition had actually been a *different* statement Miller had made to Shook back in 2003 and that Shook had not divulged to anyone other than Bennett.

- In advance of the summary-judgment hearing, appellees amended their motions and proof to address appellants' new theories, and both sides asserted objections to the other's evidence.

- The summary-judgment hearing finally went forward in July 2008. At the conclusion of the hearing, the district court took the motions under advisement, further indicating that it would not issue a formal ruling until the pending sanctions motions were set for hearing so as to avoid any potential problems with plenary power.

- In August 2008, Bennett filed bankruptcy, which served to stay proceedings in both *Bennett IV* and *Bennett III*, the latter of which had been set for trial a few days thereafter. The cases were ultimately remanded to state court in January 2009, with the bankruptcy court observing that the bankruptcy filing "appears to be a litigation tactic."

- Thereafter, in April 2009, appellants moved for leave to file a fifth amended petition that would have added a theory that appellees had violated the Racketeer Influenced and Corrupt Organizations Act (RICO). The district court would never grant such leave, however.

---

[20] In fact, in their prior pleadings, appellants had alleged that they had first discovered the facts giving rise to their causes of action in October 2004, a date corresponding to the timing of the *Bennett I* trial and verdict.

- A hearing on appellees' motions for sanctions, appellants' motion for leave to file their amended petition, and various other procedural motions was noticed for July 30, 2009. At the outset of the hearing, the district court announced its intention to grant appellees' pending summary-judgment motions, then orally ruled on appellees' objections to appellants' summary-judgment evidence. It then proceeded to hear evidence on the sanctions issues. Because the parties did not complete their respective presentations that day, the court heard further evidence at a hearing held in November 2009.

- In May 2012, the district court signed a final judgment granting appellees' summary-judgment motions and ordering that Bennett and Bonham take nothing on their claims.[21] The judgment did not specify the grounds on which the district court had relied.

- In the same judgment, the district court imposed sanctions on Bennett, Bonham, and Paris "under Rule 13 of the Texas Rules of Civil Procedure, Chapter 10 of the Texas Civil Practice and Remedies Code and under the trial judge's inherent power to regulate the conduct of the proceedings filed in this Court." Preceded by nine pages of findings detailing its grounds and reasoning, the court awarded Grant and Reynolds each $35,898 from Bennett and Bonham, jointly and severally, with Paris jointly and severally responsible for $20,274 of each amount. Miller was similarly awarded $40,000 jointly and severally from Bennett and Bonham, with Paris jointly and severally responsible for $20,000 of that amount. It additionally awarded conditional appellate attorney's fees.

This appeal ensued.

## ANALYSIS

Appellants present what are framed as three issues, although the arguments they present in support ramble through a ninety-page opening brief and a thirty-page reply. We have

---

[21] The record does not appear to explain the reasons for the hiatus, although we note that the Texas Supreme Court issued its *Bennett I* opinion in 2010, *see* 315 S.W.3d at 888; we decided *Bennett II* on remand in early 2011, *see* 2011 Tex. App. LEXIS 449, at *1; and *Bennett III* was tried in 2010 and its judgment rendered in early 2011.

attempted to focus our analysis on grounds dispositive of appellants' material contentions without belaboring others.[22]

**Venue**

In their first issue, appellants seek reversal of the judgment based on asserted error in both the Lampasas district court's ruling transferring venue to San Saba County and the San Saba district court's refusal to change venue back under Rule 257.

*Transfer of venue*

Appellants argue that the Lampasas district court[23] abused its discretion in transferring venue because appellees did not present any competent or admissible evidence in support of their motions. Appellants base this assertion entirely on the fact that appellees initially presented affidavits in support of their motions that each contained a statement that the testimony therein had been based on the "best of [each affiant's] knowledge and belief," as opposed to their "personal knowledge."[24] In response to appellants' objections to that effect, the district court, while voicing a view that other portions of the affidavits sufficiently demonstrated each affiant's personal knowledge, granted appellees leave to amend their affidavits in order to cure "any possible defect"

---

[22] *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). Similarly, passing assertions left unsupported by authorities or cogent argument have been deemed inadequately briefed and, therefore, waived. *See id*. R. 38.1(i).

[23] The Hon. Joe Carroll, then the presiding judge of the Twenty-Seventh District Court.

[24] *See* Tex. R. Civ. P. 87-3(a) ("Affidavits shall be made on personal knowledge . . . .").

11

with the objected-to "tag line."[25] The court further indicated that it intended to grant the transfer, but would hold off on signing an order until after appellees had the opportunity to file their amendments. Following the hearing, appellees filed amended affidavits that were identical to their earlier ones except for changing the aforementioned "tag line" to refer explicitly to each affiant's "personal knowledge." The court thereafter signed its order granting the motions. Although the court did not specify whether it had relied on the general venue rule versus the convenience ground, the order indicated that it had considered, among other things, "the amended affidavits."

While appellants have not questioned the competency or sufficiency of the amended affidavits in themselves, they insist that the procedure the Lampasas court followed was "totally erroneous." This was so, appellants insist, because the court had already granted appellees' motions to transfer *during the venue hearing*, not when it signed its order thereafter. And because the evidentiary record as of the hearing had included only appellees' original affidavits and not the amended ones, appellants reason that there was no competent evidence to support the court's ruling (at least at the instant appellants claim it was made).

The Lampasas court's signed order is what matters in appellate review, of course,[26] and we further fail to see any error or harm in the procedure the court employed, which served to

---

[25] *See id*. R. 87(1) (requiring that "additional affidavits supporting the motion to transfer must . . . be filed not later than 7 days prior to the hearing date"—"except on leave of court").

[26] *See, e.g.*, *Wilson v. Wachsmann*, No. 03-04-00504-CV, 2006 Tex. App. LEXIS 5850, at *15 (Tex. App.—Austin July 7, 2006, no pet.) (mem. op.) ("[T]he [trial] court's written order controls over any alleged oral pronouncement at a hearing."); *see also Cash v. Cash*, No. 03-04-00560-CV, 2005 Tex. App. LEXIS 5909, at *10-11 (Tex. App.—Austin July 27, 2005, no pet.) (mem. op.) (further observing that trial court's "oral pronouncement is often tentative . . . because the court is aware that a draft will be prepared and reviewed before the final, written judgment is signed").

streamline the proceedings by enabling a prompt, abundance-of-caution cure of what was likely a mere formal or technical evidentiary defect, at most. But we need go no farther than to observe that the district court's transfer ruling encompassed the ground of convenience and that a transfer order based on convenience (including an order that does not specify its grounds where, as here, convenience is raised) is not reviewable on appeal.[27] While appellants insist that we must scrutinize the evidence underlying the district court's order nonetheless, the Texas Supreme Court has instructed us otherwise: "[T]he statute precludes review not just of the evidence, but of the [transfer] order itself. As a result, it is irrelevant whether a transfer for convenience is supported by any record evidence."[28] The Lampasas district court's order transferring venue to San Saba County, in short, is "statutorily beyond review."[29]

### Change of venue

Regarding their motion to change venue back to Lampasas County under Rule 257, appellants complain that the district court erred or abused its discretion in proceeding to decide appellees' pending summary-judgment motions before taking up their motion. Relatedly, they insist

---

[27] *See* Tex. Civ. Prac. & Rem. Code § 15.002(c) ("A court's ruling or decision to grant or deny a transfer under Subsection (b) [convenience] is not grounds for appeal or mandamus and is not reversible error."); *Garza v. Garcia*, 137 S.W.3d 36, 39 (Tex. 2004) ("Because the transfer order here includes no reasons, we cannot be certain on which of the two grounds it was granted; one ground was convenience, . . . As the [trial] judge certainly might have intended to grant it on convenience grounds, we cannot ignore the Legislature's ban on reviewing such orders by adopting a new presumption so we can review them anyway.").

[28] *Garza*, 137 S.W.3d at 39.

[29] *Trend Offset Printing Servs., Inc. v. Collin Cnty. Cmty. College Dist.*, 249 S.W.3d 429, 430 (Tex. 2008) (per curiam).

13

that the district court had no discretion but to grant their Rule 257 motion. Appellants reason that (1) Rule of Civil Procedure 258 requires that a motion "duly made" under Rule 257 "shall be granted" unless the non-moving party files a response with controverting evidence;[30] (2) Rule of Civil Procedure 87 imposes a deadline for responding to motions to transfer of thirty days prior to the date of the hearing "[e]xcept on leave of court,"[31] and (3) while appellees moved to continue the hearing about two weeks before the scheduled April 24, 2008 hearing date, which the district court granted a few days beforehand, appellees had not filed any controverting proof or obtained leave to file proof later *by the original thirty-day response deadline that was tied to the continued April 24 scheduled hearing date*. Upon expiration of that original thirty-day deadline, appellants deduce, the district court had a mandatory duty to grant their Rule 257 motion that was unaltered by the subsequent events.

While appellants decry the continuance as "incredible," we find no basis for reversal. By continuing the hearing, the district court would have effectively re-set the thirty-day response deadline on which appellants place so much emphasis. Nor can we conclude that the district court abused its discretion in regard to either of the grounds for continuance asserted by appellants, the need to obtain additional evidence and the efficiencies of obtaining a ruling on the potentially dispositive summary-judgment motions first.[32] Regarding the latter ground, appellants emphasize

---

[30] *See* Tex. R. Civ. P. 258.

[31] *Id*. R. 87(1).

[32] *See Union Carbide Corp. v. Moye*, 798 S.W.2d 792, 793 (Tex. 1990) (orig. proceeding); *see also Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986) ("The granting or denial of a motion for continuance is within the trial court's sound discretion. The trial court's action will not be disturbed unless the record discloses a clear abuse of discretion.") (internal citations omitted).

the concept that trial courts should resolve venue questions before proceeding on the merits. While this concept may be relevant in the context of motions to transfer venue, which are governed ultimately by the regulatory framework prescribed in chapter 15 of the Civil Practice and Remedies Code, the basis of appellants' motion under Rule 257 was instead that an impartial jury could not be assembled in San Saba County.[33] As appellees argued, that ground could be (and ultimately was) rendered moot by the district court's summary-judgment rulings, which did not require a jury and obviated the need for one. We cannot conclude that the district court erred or abused its discretion by proceeding as it did.

We overrule appellants' first issue.

## Summary judgment

In their second issue, appellants challenge the district court's summary-judgment rulings. They again place great emphasis on procedural defects they perceive.

### *Scope*

Appellants first point out that appellees' summary-judgment motions did not challenge the RICO theory they purported to add in their fifth amended petition. Consequently, they reason, the motions were insufficient to support rendition of a final, take-nothing summary judgment disposing of all of their claims. But the flaws in this argument begin with the fact that, as previously indicated, appellants did not attempt to file their fifth amended petition until April 2009, roughly

---

[33] Appellants' complaint was solely about the potential jury pool. They did not assail the impartiality of the trial judge, let alone preserve any such complaint. *See* Tex. R. Civ. P. 18a(b)(1), 18b(b)(1), (2). In fact, at one juncture, appellants suggested a change of venue to Burnet County, emphasizing that it was the presiding judge's home county.

nine months after the July 2008 summary-judgment hearing. As appellants tacitly acknowledged by filing a motion for leave when offering their new petition, a pleading amendment filed subsequent to a summary-judgment hearing is ineffective without leave of court.[34] Yet appellants never obtained an order granting them such leave.

Undeterred, appellants offer alternative interpretations of the record in an attempt to demonstrate that their RICO theory was before the district court after all. On one hand, they urge that the district court *impliedly* granted them leave to file their amendment, but any such notion is belied by Paris himself, who twice acknowledged during the sanction hearings that the district court had not granted the required leave and that appellants' fifth amended petition, as Paris put it, "has not been accepted by the court." Shifting gears, appellants also insist that they filed their fifth amended petition timely because the relevant summary-judgment hearing for deadline purposes was actually the July 2009 hearing at which the district court announced its intended summary-judgment ruling and proceeded to hear evidence on sanctions. Why appellants think this is so, as best we can understand their arguments, is that (1) appellees attempted to file some supplemental summary-judgment affidavits within seven days of the July 2008 hearings; (2) appellants objected; (3) the district court issued no written ruling on the objection (although it did rule orally); (4) the court ultimately recited in its final judgment that it had considered "all competent summary judgment evidence, including affidavits"; (5) which, according to appellants, meant that the late-filed and objected-to supplemental affidavits had effectively caused a "non-finality of the summary judgment

---

[34] *See* Tex. R. Civ. P. 63; *Goswami v. Metropolitan Sav. and Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988); *Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 593 (Tex. App.—Austin 2013, pet. denied); *Witkowski v. Brian, Fooshee and Yonge Props.*, 181 S.W.3d 824, 833 (Tex. App.—Austin 2005, no pet.).

hearing until July 30, 2009." We reject appellants' novel view of the record, which instead reflects that the July 2008 hearing was the final summary-judgment hearing noticed in the case and that the district court did not subsequently reopen the summary-judgment record.

In short, appellants' live pleading was their fourth amended petition, in which Bennett and Bonham asserted theories of "fraud," "participation in fraudulent acts," business disparagement, tortious interference, and "conspiracy"—each of which was predicated on the "coffee-shop talk" alleged to flow from the Barbeque Statement.

### Grounds

Appellees sought summary-judgment on "traditional" grounds that purported to negate various elements of appellants' liability theories and establish affirmative defenses of limitations and privilege.[35] They also asserted no-evidence grounds challenging these elements and others. The challenged elements included causation, an essential element of each of appellants' theories.[36] In its judgment granting the motions, the district court did not specify the grounds on

---

[35] Notably absent were any assertions that the *Bennett IV* suit was an improper collateral attack on the *Bennett I* judgment or was barred by the related principles of claim or issue preclusion. Accordingly, we do not address the potential implications of these doctrines, let alone imply that the *Bennett IV* suit could survive such a challenge.

[36] *See, e.g.*, *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (business disparagement); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (fraud); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) (civil conspiracy); *Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (tortious interference).

17

which it relied. In such circumstances, we are to affirm the judgment if any of the grounds appellees presented to the district court and preserved for appellate review are meritorious.[37]

Appellants insist that the district court's judgment reflects that it relied solely on traditional grounds, to the exclusion of no-evidence grounds. This is so, appellants reason, because the judgment recited that the court had considered "all competent summary judgment evidence, including affidavits and documentary evidence." We reject appellants' view of the judgment, as the referenced language is not inconsistent with the court having additionally or alternatively relied on no-evidence grounds.[38]

Appellants also complain that they were deprived of the "adequate time for discovery" required by Rule 166a(i). We cannot conclude that the district court erred or abused its discretion in this regard. The record reflects that, among other factors the district court could have considered, the discovery period had expired several months before the summary-judgment hearing was ultimately held in July 2008, that appellants had not actively pursued discovery when they had the opportunity to do so, and that appellants had been able to obtain multiple rounds of affidavits and supplements in their attempts to raise fact issues in support of their evolving liability theories.[39]

---

[37] *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 217 (Tex. 2003).

[38] *See id.*; *see also Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) ("[A]s long as a motion clearly sets forth its grounds and otherwise meets the requirements of a no-evidence summary judgment motion . . . it is sufficient as one.").

[39] *See* Tex. R. Civ. P. 166a(i) cmt. ("A discovery period . . . should be an adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a motion under paragraph (i) would be permitted after the period but not before."); *see also Reule v. Colony Ins. Co.*, 407 S.W.3d 402, 406-07 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (discussing factors courts consider in determining whether district court allowed adequate time for discovery, including nature of case); *see also Akhter v. Schlitterbahn Beach Resort Mgmt., LLC*, No. 03-13-00117-CV,

18

In sum, we may affirm the summary judgment based on any of the grounds appellees presented in their motions, if meritorious, whether they be traditional or no-evidence grounds. Appellants challenge whether any such grounds have merit. We turn to that question now.

*Merits*

We review summary-judgment rulings de novo.[40] Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.[41] We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor.[42]

While appellees had the initial burden to conclusively establish their traditional summary-judgment grounds,[43] appellees' no-evidence grounds placed the burden on appellants to present summary-judgment evidence raising a genuine issue of material fact.[44] No-evidence summary judgments are accordingly reviewed under the same legal-sufficiency standard as directed

---

2013 Tex. App. LEXIS 10522, at *6-13 (Tex. App.—Austin Aug. 22, 2013, no pet.) (mem. op.) (similarly rejecting complaint that non-movant had not been afforded an adequate time for discovery before trial court granted no-evidence summary judgment).

[40] *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 331 S.W.3d 419, 422 (Tex. 2010).

[41] Tex. R. Civ. P. 166a(c); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

[42] *See Urena*, 162 S.W.3d at 550.

[43] *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam).

[44] Tex. R. Civ. P. 166a(i); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206 (Tex. 2002).

19

verdicts[45] and will be sustained when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact."[46]

Without being exhaustive, there were at least three sets of summary-judgment grounds preserved by appellees that were meritorious—and quite obviously so.

*Reliance*

The first ground relates to appellants' "fraud" theory, which appellants pled as both an independent basis of recovery and a predicate for their "conspiracy" theory. Appellees asserted both traditional and no-evidence grounds challenging whether appellants had justifiably relied upon the Barbeque Statement, as required to recover for fraud,[47] considering that appellants had, on one hand, claimed to have been unaware of the Statement until long after the *Bennett I* trial while also having steadfastly and vigorously disputed the truth of its substance even before that trial. In an attempt to overcome these inconvenient facts, appellants have emphasized cases recognizing that the intent element of fraud (as opposed to the reliance element) does not necessarily require a direct relationship between the alleged fraudfeasor and a specific known victim, but may be satisfied by proof that the alleged victim was among a "class" for whom "the maker of the misrepresentation

---

[45] *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750 (Tex. 2003).

[46] *Id*. at 751 (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

[47] *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (recognizing reliance as element of fraud).

20

[has] information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct."[48] From this line of cases, appellants extrapolate that Miller should be deemed to have known or reasonably should have known of an "especial likelihood" that the Barbeque Statement would reach the *Bennett I* jurors and influence their conduct. But as for how any such intent regarding the *Bennett I* jurors equals "fraud" upon Bennett and Bonham themselves, appellants further deduce from the aforementioned case law that they are within the same "class" as the jurors. Specifically, appellants explain, Bennett and Bonham are part of the same "rural ranching community" as the *Bennett I* jurors and, further, are their "peers" by definition. Accordingly, appellants reason, they can stand in the shoes of the *Bennett I* jurors and sue appellees for their "fraud."

Appellants grossly distort the governing legal principles. Even if it could be said that Bennett and Bonham are members of a common "class" with the *Bennett I* jurors in any material sense,[49] appellants' arguments would go only to the intent element of their fraud theory. To recover for fraud, appellants must also prove the distinct and additional element that they actually and justifiably relied upon the Barbeque Statement.[50] This they cannot do as a matter of law for reasons that include the conclusively established fact that Bennett and Bonham have disputed the substance of the Barbeque Statement at every turn. Nor could Bennett and Bonham merely piggyback on any

---

[48] *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 581 (Tex. 2001) (quoting Restatement (Second) of Torts § 531 cmt. d (1977)).

[49] Appellees have pointed out that Bonham, as a corporate rather than natural person, is ineligible to serve on a jury, but we need not beat this dead horse further.

[50] *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (citing *Ernst & Young*, 51 S.W.3d at 583).

"fraud" allegedly perpetuated on the *Bennett I* jurors—the Texas Constitution jurisdictionally requires that any injury from fraud be to *them*.[51] And even if they could, we will momentarily demonstrate that there is no competent evidence the *Bennett I* jurors had even heard of the Barbeque Statement, let alone relied on it. For all of these reasons, the district court properly granted summary judgment as to appellants' "fraud" claims and derivative "conspiracy" claims.[52]

*Limitations*

As for appellants' remaining liability theories—business disparagement, tortious interference, and derivative "conspiracy" liability—the district court properly granted summary judgment based on limitations. Each of these alleged causes of action is governed by the two-year statute of limitations,[53] which meant that, all other things being equal, the cause had to accrue sometime after April 2005, two years before appellants filed *Bennett IV*. A cause of action normally accrues when a defendant's alleged wrongdoing causes some legal injury.[54] Appellants attribute their claimed injuries to the Barbeque Statement, which they alleged to have occurred in

---

[51] *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 155 (Tex. 2012) ("The plaintiff must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury.")

[52] *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (explaining that civil conspiracy is derivative tort in which "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable").

[53] *See* Tex. Civ. Prac. & Rem. Code § 16.003(a); *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 924 (Tex. 2013) (tortious interference); *Newsom v. Brod*, 89 S.W.3d 732, 734 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (business disparagement).

[54] *See, e.g.*, *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam).

August 2004—more than two years before appellants filed *Bennett IV*.[55] And while appellants purport to invoke the discovery rule, which (if applicable[56]) would toll accrual until the point in time when they either knew or should have known the nature of their injury,[57] we need go no farther than to observe that Bennett and Bonham had notice of the Barbeque Statement from the instant it was made—it was uttered to Mr. Shook, their lawyer at the time.[58] Accordingly, the district court appropriately granted summary judgment as to these claims based on limitations.

*Causation*

The third set of meritorious summary-judgment grounds we will note—and one fatal to all of appellants' liability theories—consists of no-evidence challenges to the causation element of each theory—specifically, cause-in-fact. To raise a fact issue that the Barbeque Statement was the cause-in-fact of the *Bennett I* jury rendering its adverse verdict, appellants had the burden of presenting competent summary-judgment evidence of each of the following facts:

---

[55] Although appellants repeatedly attempt to characterize appellees' actions as a "continuing tort," it remains that they ultimately relied on the theory that all their claimed injuries stem from Miller's one-time utterance of the Barbeque Statement.

[56] *See id.* at 313-14 (observing that whether an injury is "inherently undiscoverable," such that the discovery rule applies, is a "legal question . . . decided on a categorical rather than case-specific basis; the focus is whether a *type* of injury rather than a *particular* injury was discoverable") (emphases in original).

[57] *See, e.g.*, *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 121 (Tex. 2001).

[58] *See Lehrer v. Zwernemann*, 14 S.W.3d 775, 778 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("Knowledge or notice to an attorney, acquired during the existence of the attorney-client relationship and while acting within the scope of his authority, is imputed to the client."). We would further observe that the principal component of appellants' claimed damages—the *Bennett I* verdict—was rendered in October of the same year.

23

- the Barbeque Statement was overheard by one or more of the persons in attendance at the Weatherbys other than Shook (as there is no contention that Shook is responsible for any republication of the Statement or alleged harm therefrom);

- such other person or persons then disseminated the Barbeque Statement directly or indirectly to the same persons who were selected as jurors in *Bennett I*;

- those jurors believed the Barbeque Statement; and

- those jurors were moved to render their verdict based upon the Barbeque Statement and would not have done so otherwise (notwithstanding the evidence detailed extensively in the *Bennett I* opinions of the Texas Supreme Court and of this Court).

While there is evidence that at least one bystander at the Weatherbys overheard Miller utter the Barbeque Statement,[59] appellants did not present any competent proof that any such individuals ever republished the Statement to anyone else, let alone that it reached the *Bennett I* jurors, let alone that it caused those jurors to render the verdict they did.

In attempting to meet these burdens, appellants rely on a succession of affidavits and supplemental affidavits from Bennett (these evolved, like appellants' liability theories, in the face of appellees' summary-judgment challenges). In relevant part, Bennett stated that the Barbeque Statement "became coffee shop talk in San Saba, Texas, by local town persons and were overheard by persons I know in San Saba, Texas, which is a small community [and] had an affect on [the *Bennett I*] jurors . . . , who rendered a $1,000,000.00 judgment against [Bonham], as well as a judgment against me." Bennett does not elaborate as to how or by whom these purported events occurred, nor supply any other underlying facts to support his conclusions. Without more,

---

[59] Miller averred that "I do not know that anyone but Mr. Shook and Mr. Weatherby overheard my statement." Shook, on the other hand, provided an affidavit in which he indicated that the Barbeque Statement was uttered "within the hearing of others present," but did not specify who.

24

his assertions, which do little more than repeat or paraphrase his pleading allegations, are not competent summary-judgment proof.[60]

Appellants additionally rely on affidavits they obtained from former counsel Shook; another former counsel who had represented Bennett and Bonham in *Bennett I*, Keith Woodley; and a corporate attorney for Bonham or Bennett, James E. Cummins. Woodley and Cummins testified to the effect that San Saba is a small Texas town and that an allegation or rumor that a person was involved in "drugs or prostitution" would tend to spread around the community.[61] But as for whether the Barbeque Statement actually *did* spread in this manner, let alone reach the *Bennett I* jurors, appellants can come no closer than obtaining a statement from Shook that the Barbeque Statement was "disseminated to the public in San Saba County, Texas." Like Bennett, Shook did not elaborate as to the factual basis of his statement, nor indicate whether or how the "public" to whom the Statement purportedly was "disseminated" actually included the *Bennett I* jurors, let alone that it had any impact on them. Accordingly, his testimony is not competent evidence of these facts.[62]

---

[60] *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004); *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996).

[61] Incidentally, Woodley's law office is in Comanche County and Cummins's is in Navarro County.

[62] *See Coastal Transp.*, 136 S.W.3d at 232. Similarly, Cummins, whom appellants purported to present as an expert, testified that he was "of opinion that the jury in [*Bennett I*] actually and justifiably relied on Mr. Miller's false statements that [Bennett] was into drugs and prostitution . . . and that this lead [sic] to a damaging verdict against [Bennett] and [Bonham]." The district court excluded this testimony, and it would have been incompetent in any event, as Cummins supplied no factual basis for his opinions. *See Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) ("[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand on the mere ipse dixit of a credentialed witness.").

25

Tellingly, appellants ultimately place chief reliance on a hodgepodge of purported "presumptions" they would derive from the lawyer disciplinary rules, case law addressing jury misconduct, and even the size of San Saba County's population. Specifically, appellants accuse Miller, in uttering the Barbeque Statement, of violating Rule 3.07 of the Texas Disciplinary Rules of Professional Conduct, which prohibits a lawyer, "in the course of representing a client," from making "an extra judicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding."[63] They then observe that the constitutional justifications for such restrictions are state interests in protecting the integrity and fairness of its judicial system.[64] To this they add the observation that "[a]n irrebuttable presumption may be judicially created, as through a disciplinary rule," citing the example of presumptions regarding acquisition of confidential information that operate in the context of motions to disqualify lawyers and law firms.[65] Appellants then put all of this together to deduce that the Barbeque Statement gave rise to an "irrebutable presumption" that it reached and impacted the *Bennett I* jury. To similar effect, appellants also insist that the Barbeque Statement amounts to the sort of overt attempt at jury tampering that has been held to establish, in itself, "probable injury . . . prima facie at least," as required to obtain a new trial based on jury misconduct.[66]

---

[63] It seems that Mr. Paris was employed as an assistant general counsel for the State Bar back in the 1970s.

[64] *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1065-76 (1991).

[65] *In re Mitcham*, 133 S.W.3d 274, 276-77 (Tex. 2004) (per curiam).

[66] *Texas Employers' Ins. Ass'n v. McCaslin*, 317 S.W.2d 916, 921 (Tex. 1958).

Appellants' notion of a disciplinary rule-based "irrebutable presumption" of jury impact from the Barbeque Statement dissolves in its own incoherence and lack of legal support. Their alternative "presumption" theory based on asserted jury tampering is similarly without merit for reasons that include, among other problems, the aforementioned absence of competent summary-judgment evidence that the Barbeque Statement ever actually reached the *Bennett I* jurors.[67] And even if these "presumption" theories could have any conceivable merit in other contexts, it would be quite another thing to allow appellants to employ them as a substitute for the bedrock requirement that a tort plaintiff must present legally sufficient evidence that a defendant more likely than not caused its injury before the defendant can be compelled to compensate the plaintiff in damages.[68] To permit appellants to recover damages without proving that appellees more likely than not caused their injury would "abandon the truth-seeking function of the law."[69]

At bottom, appellants seem to urge that because the Barbeque Statement was uttered or overheard by a resident of San Saba County, and because San Saba County's population is considered "small" and perhaps more closely knit than is often true of more urbanized counties nowadays, and because the *Bennett I* jury was drawn from this same population, they may dispense

---

[67] *Cf. id.* at 918 (addressing jury misconduct where plaintiff personally went to juror's place of business, "engaged [the juror] in conversation," and "concluded the conversation by saying: 'Be sure and do all you can to help me' or something of a similar nature").

[68] *See, e.g.*, *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 405 (Tex. 1993); *see also Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 613 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("The Texas Disciplinary Rules of Professional Conduct do not define standards for civil liability and do not give rise to private claims.").

[69] *Kramer*, 858 S.W.2d at 405 (quoting *Falcon v. Mem'l Hosp.*, 462 N.W.2d 44, 66 (Mich. 1990)).

with any conventional requirements of proving a causal linkage between the Barbeque Statement and the *Bennet I* verdict and simply assume that fact to be so. We need only observe that tort law works the same way in Texas's rural counties as it does in our big cities. Absent competent evidence of a causal linkage between the Barbeque Statement and the *Bennett I* verdict, the district court properly granted summary judgment on that ground as to all of appellants' theories predicated on that injury.

In a final rejoinder regarding causation-in-fact, appellants insist that their business-disparagement and tortious-interference theories are not predicated entirely on the *Bennett I* verdict, but derive at least in part from additional injury allegedly caused by the Barbeque Statement and resultant "coffee-shop talk." They insist that they have raised a fact issue that the Barbeque Statement caused at least these injuries. To the contrary, appellants have again presented no competent summary-judgment evidence of any such causal linkage. They rely on affidavit testimony from Bennett and Bert Holland, but both consist merely of bare conclusions without factual support.[70] As with appellants' other liability theories, the district court properly granted summary judgment based on lack of causation evidence.

We overrule appellants' second issue.

---

[70] For example, Holland asserted, without elaboration, that "[appellants] have been prevented from selling the Ranch in San Saba, Texas because of present belief that the business of [appellants] are involved in drugs and prostitution." Furthermore, this testimony and much of Bennett's on this point was excluded by the district court, although appellees appear to assume that Holland's testimony was admitted.

Incidentally, Holland would later testify during the sanctions hearing that he had lacked personal knowledge of the subject matter of his testimony and had relied solely on Bennett's account of the underlying facts.

**Sanctions**

In their third issue, appellants complain of the sanctions awards imposed against each of them. "A trial court's imposition of sanctions is reviewed on appeal for abuse of discretion."[71] "An assessment of sanctions will be reversed only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable."[72] "The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision."[73]

As previously indicated, the district court explicitly based its imposition of sanctions on Chapter 10 of the Civil Practice and Remedies Code, Rule 13 of the Texas Rules of Civil Procedure, and the court's own inherent power,[74] and any one of them will suffice if meritorious.[75] We will focus our analysis on Chapter 10. Chapter 10 authorizes trial courts to sanction a party or lawyer for filing a pleading or motion that does not, "to the signatory's best knowledge, information, and belief, formed after reasonable inquiry," comply with each of the following relevant requirements:

---

[71] *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (citing *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007)); *Zeifman v. Nowlin*, 322 S.W.3d 804, 809 (Tex. App.—Austin 2010, no pet.).

[72] *Unifund*, 299 S.W.3d at 97.

[73] *Id*. (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998)).

[74] While appellants insist that the district court based sanctions solely on Chapter 10, the judgment states otherwise.

[75] *Zeifman*, 322 S.W.3d at 809.

(1)     the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)     each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)     each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . .[76]

In other words, Chapter 10 authorizes sanctions where a lawyer or party files a pleading that is *either* groundless *or* brought for an improper purpose, and does not require both.[77]  Further, as the Texas Supreme Court has explained,

> Under [Chapter 10], the signer of a pleading or motion certifies that *each* claim, *each* allegation, and *each* denial is based on the signatory's best knowledge, information, and belief, formed after reasonable inquiry.  The statute dictates that each claim and each allegation be individually evaluated for support.  The fact that an allegation or claim is alleged against several defendants—so-called "group pleadings"—does not relieve the party from meeting the express requirements of Chapter 10.  Each claim against each defendant must satisfy Chapter 10.[78]

---

[76]  Tex. Civ. Prac. & Rem. Code § 10.001.

[77]  *See Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 411-12 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *see also Zeifman v. Michels*, No. 03-12-00114-CV, 2013 Tex. App. LEXIS 10523, at *31 (Tex. App.—Austin Aug. 22, 2013, no pet.) ("[S]anctions under chapter 10 can be awarded if the suit was filed for an improper purpose, even if the suit was not frivolous.").

[78]  *Low*, 221 S.W.3d at 615.

Chapter 10 requires the trial court to describe in its order "the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed."[79] In its judgment, the district court made findings that would support the imposition of sanctions based on violations of any of the three alternative requirements under Chapter 10 quoted above. It explicitly found or concluded that "this suit [*Bennett IV*] is groundless and was filed in bad faith and for the purpose of harassment," language that tracks Rule 13 but would also satisfy elements of Chapter 10. In support, the court made extensive underlying findings that began by noting powerful circumstantial proof of appellants' improper purpose in prosecuting *Bennett IV*—Bennett's (and, through him, Bonham's) long history of vitriolic, threatening, and harassing behavior toward appellees, both in and out of court. This included their conduct in *Bennett I* (in which, as the district court observed, "the opinions of the appellate courts detail an exhaustive list of egregious litigation tactics employed by Bennett and Bonham, including bribing witnesses, threatening witnesses, harassing witnesses, urging witnesses to lie, tampering with evidence and filing a lawsuit to harass and intimidate a witness"); Bennett's slander claims against Grant in *Bennett III* (which Bennett filed, as the district court noted, after "Grant decided to testify in [the] criminal case against Bennett for cattle theft and as a witness in [*Bennett I*]); and Bennett's unsuccessful efforts to have Grant criminally prosecuted "by approaching at least four separate prosecutors in three different counties" and finally "procur[ing] the appointment of a special prosecutor in Navarro County" (later

_____

[79] Tex. Civ. Prac. & Rem. Code § 10.005.

the subject of Grant's malicious-prosecution claims in *Bennett III*).[80]  Additionally, the district court

found—and it is undisputed—that during the aftermath of the *Bennett I* verdict, Bennett had filed

two lawyer disciplinary grievances against Miller, both of which were "summarily dismissed and

reclassified as an inquiry."  Undaunted, Bennett had appealed one of these rulings to the Board of

Disciplinary Appeals, without success.  It was "[a]fter Bennett's unsuccessful attempts at criminally

prosecuting Grant and having Miller professionally disciplined," the district court further observed,

that Bennett and Bonham filed *Bennett IV*.

 The district court also pointed to appellants' tactics in *Bennett IV* itself, for which it

found Bennett, Bonham, and Paris to be jointly responsible.  Among other things, the court found

that appellants had persisted in pressing allegations entirely lacking in factual support and without

regard for their truth.  The court cited allegations by appellants—included in each iteration of their

pleadings—that Grant had been the originating source of the Bennett "drugs and prostitution"

rumor and that Miller and Reynolds had conspired to circulate the rumor.  As the court pointed out,

appellants had never attempted to support their allegation that Grant had originated the rumor.  As

for Reynolds's supposed involvement, Paris similarly acknowledged that the sole factual basis for

implicating Reynolds in this supposed "conspiracy" was that "he was the recipient of the wrongful

judgment that's based upon the [Barbeque Statement]" uttered by Miller.

 The district court found the same to be true of appellants' central allegation that the

*Bennett I* jurors—and, indeed, "all those in the community [of San Saba County]"—"had heard [the

---

[80]  The district court had taken judicial notice of the *Bennett I* appellate opinions and the case file from *Bennett III*.  Further, the trial judge who presided over *Bennett IV*, the Hon. Gil Jones, had also tried *Bennett III* to judgment.

Barbeque Statement]." In particular, the court referenced testimony from Paris acknowledging that he had never bothered to inquire with the *Bennett I* jurors or other members of the venire panel as to whether they had heard of the Barbeque Statement prior to their verdict. In contrast, appellees presented affidavits from ten members of the *Bennett I* jury who uniformly averred that they had never heard of the subject matter of the Barbeque Statement prior to their verdict, nor even until appellees approached them to inquire in 2009.

In response to these criticisms of his professional conduct, Paris had insisted that he bore no responsibility to independently inquire into or develop proof of these facts because they were conclusively supplied by the "presumptions" he had previously urged. The district court rejected this attempt "to cover the lack of evidentiary support for [appellants'] groundless allegations" by seeking "to excuse them [with] frivolous legal arguments, such as by claiming the law presumes everyone in the community became aware of the conversation between Miller and Shook." Similarly, it added that "[t]he fraud count on which this suit was originally based was fatally defective to such an extent as to be frivolous," for reasons that included the inability of Bennett and Bonham to "prove[] they relied on the derogatory statements made about them in the [Barbeque Statement]." Further, the court observed that appellants had repeated this fraud theory in every one of their petitions "even though this Court [had] pointed out the deficiencies of that cause of action at the first hearing on summary judgment in this case."

Making matters worse, the district court found, was a "practice" by appellants—"usually corresponding with a hearing on another motion for summary judgment"—of amending their pleadings to add new theories, including business disparagement and tortious interference. The court observed that "[n]o summary judgment evidence ever identified a person

33

who refused to do business with [appellants] or any specific contract that was lost because someone had heard of the [Barbeque Statement]." It added that "[o]nly vague and conclusory affidavits were filed in response" to appellees' summary-judgment motions, and that an especially "glaring example of the manner in which [appellants] abused the summary judgment process" had involved the affidavit of Bert Holland. Although Holland had provided an affidavit asserting, without elaboration, that the Barbeque Statement had prevented Bennett from selling his San Saba County property, the court noted that Holland had subsequently recanted that testimony, "admitting that he knew of no lost business or lost sales and was just saying what Mr. Bennett had told him."

On appeal, appellants insist there is no evidence to support the district court's findings underlying its imposition of sanctions. They further suggest that the district court sanctioned them merely because it had ultimately rejected the merits of their claims. We disagree that the district court's findings can be dismissed so easily. For reasons that are apparent throughout our analysis of appellants' first two issues, we cannot conclude that the district court abused its discretion in finding that appellants persisted in advocating numerous legal theories that were unsupported by any non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. Indeed, appellants advocated theories that ranged from pettifoggery to the bizarre. Appellants also admitted to numerous failures to conduct even rudimentary investigation regarding material facts and also engaged, as the district court found, in a pattern of tactical gamesmanship to delay the inevitable dismissal of their claims. And while it has occurred to us (having addressed *Bennett I*, then *III*, and now *IV*) that Mr. Bennett might genuinely perceive that various of his misfortunes are traceable to a conspiracy between Reynolds and Grant

34

(with Miller as the Keyser Söze-like mastermind behind it all[81]), appellants' prosecution of *Bennett IV* in that context is also consistent with the tactics of disgruntled unsuccessful litigants who persist in re-litigating merely to punish and harass.[82] The district court did not abuse its discretion in imposing sanctions against Bennett, Bonham, and Paris.

Appellants also complain of the amounts of each sanctions award. The district court found that an appropriate sanction was to award Reynolds and Grant each $35,898, an amount representing their litigation costs "incurred in defending against this frivolous lawsuit," with Bennett and Bonham jointly and severally liable for the total amount of each award and Paris jointly and severally liable for $20,274. As for Miller, the district court awarded him a total of $40,000, representing "reasonable expenses, and a sum for inconvenience and harassment equal to what he could have earned had he spent his time [that] this case necessarily cost him on matters that would have compensated him in his practice as an attorney." Similar to the other awards, the district court made Bennett and Bonham jointly and severally liable for the total award and Paris jointly and severally liable with them for $20,000 of it. Although Chapter 10 explicitly permits this sort of sanctions award,[83] appellants complain essentially that appellees did not strictly comply with the procedures and requirements for proving reasonable and necessary attorney's fees—i.e., that there was no evidence that the fees were "reasonable and necessarily incurred," "properly

---

[81] *See The Usual Suspects* (Gramercy Pictures 1995).

[82] *See, e.g.*, *Cocke v. Elliott*, No. 03-12-00667-CV, 2013 Tex. App. LEXIS 10736, at *1-10, 18-26 (Tex. App.—Austin Aug. 27, 2013, pet. denied) (mem. op.).

[83] Tex. Civ. Prac. & Rem. Code § 10.004(c)(3) ("A sanction may include . . . an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees.").

segregated from other work," supported by documentary evidence, or supported by "proper

testimony regarding the lodestar approach to proof."[84]  These requirements do not apply to the

assessment of sanctions based on attorney's fees.[85]  Instead, we review the award of attorney's fees

using the same abuse-of-discretion standard we apply to sanctions generally, reviewing the record for

some evidence that supports the district court's decision.[86]  In this record, there is detailed testimony

from Darrell Spinks, the attorney for Reynolds and Grant, explaining both his hourly rate and the

many hours he spent defending this case, and based on that testimony, we cannot conclude that the

amount of sanctions awarded to Reynolds and Grant was arbitrary or unreasonable.[87]  We similarly

---

[84]  *See, e.g.*, *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760-61 (Tex. 2012) (explaining lodestar method of proof and need for documentary evidence to prove that fees were reasonable and necessary); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311-14 (Tex. 2006) (explaining need for claimants to segregate fees between claims for which fees are recoverable and claims for which they are not).

[85]  *See Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 816-17 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("In cases in which the judgment is not one for earned attorney's fees, but rather a judgment imposing attorney's fees as sanctions, it is not invalid because a party fails to prove attorney's fees."); *Miller v. Armogida*, 877 S.W.2d 361, 365 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required."); *see also JNS Enter., Inc. v. Dixie Demolition, LLC*, 430 S.W.3d 444, 459 (Tex. App.—Austin 2013, no pet.) (rejecting contention that attorney's fees awarded as sanctions needed to be segregated).

[86]  *See Unifund*, 299 S.W.3d at 97; *Low*, 221 S.W.3d at 614.

[87]  Spinks testified that he billed at a rate of $175 per hour and that he had spent at least 206.3 hours defending this case, for total fees of $36,102.50.  Spinks also testified that he had incurred $1,996.61 in expenses and had worked an additional six hours preparing for the sanctions hearing and allotted eight hours for attending the hearing, which added $2,450 in attorney's fees.

cannot conclude that the amount of sanctions awarded to Miller, who represented himself during the proceedings below, was arbitrary or unreasonable.[88]

We overrule appellants' third issue.[89]

## CONCLUSION

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   August 22, 2014

_____

[88]   Miller testified that he had spent "well over a hundred hours" working on this case and that his time had cost him $200 per hour that he could have earned working on other cases.

[89]   In their reply brief, appellants argue for the first time that there was no proof of appellate attorney's fees.  Generally, we do not address issues that are raised for the first time in a reply brief, unless exceptional circumstances apply.  *See, e.g.*, *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 72 (Tex. App.—San Antonio 2011, no pet.); *Strauss v. Belt*, 322 S.W.3d 707, 715 n.6 (Tex. App.—Austin 2010, no pet.); *Zurita v. Lombana*, 322 S.W.3d 463, 477 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Bankhead v. Maddox*, 135 S.W.3d 162, 164 (Tex. App.—Tyler 2004, no pet.); *Sunbeam Envtl. Servs., Inc. v. Texas Workers' Comp. Ins. Facility*, 71 S.W.3d 846, 851 (Tex. App.—Austin 2002, no pet.); *see also* Tex. R. App. P. 38.3 (limiting scope of reply brief to "addressing any matter in the appellee's brief").  We find no such circumstances here.